**ESTATE of Bernard L. PORTER, Deceased, et al., Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

**No. 71–1001.**

United States Court of Appeals,
First Circuit.

May 10, 1971.

J. Robert Seder, Worcester, Mass., with whom Seder & Seder, Worcester, Mass., was on brief, for appellants.

William K. Hogan, Atty., Tax Division, Dept. of Justice, with whom Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks and Elmer J. Kelsey, Attys., Tax Division, Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This case involves a deficiency of $11,-612.34 assessed by the Tax Court against the estate of Bernard L. Porter on the value of certain death benefits provided by the decedent's employers to his widow. The decedent, a rug manufacturer, was in business with his two brothers. The brothers each owned one third of the stock of Oxford Mills, Inc., and Quabbin Spinners, Inc., and these two corporations owned all the stock of Fiber Processing Co., Inc. Also, the brothers constituted the board of directors of all three corporations, and each was employed by all three.

On January 29, 1964, the three corporations entered into identical agreements with each of the brothers. These agreements provided that, in order for the company "to assure itself of the continued services, advice, and experience of the Employee" and "as an inducement to the Employee to remain in the Company's employ, * * * in the event of the Employee's death while in the employ of the Company," the latter would pay to his widow an amount equal to twice the compensation he had received during his final year of employment. The payments were to be made in monthly installments over a period of ten years. On January 30, the day after the agreements were executed, Porter entered the hospital to undergo gall bladder surgery. He died on February 16, having been ill for approximately four months prior to death. The companies made the required payments to his widow. The estate paid the deficiency assessed by the Commissioner, and petitioners brought this suit in the Tax Court. The Tax Court held that the death benefits were taxable as a gift made in contemplation of death under 26 U.S.C. § 2035, 54 T.C. 1066 (1970),[1] and petitioners appealed.

■ The parties agree that the death benefits in question are not taxable under § 2039—the provision under which most employee death benefits are now taxed—since in the instant case the decedent had no right to receive any part of those benefits during his life. However, the legislative history accompanying the enactment of § 2039 in 1954 indicates that this provision was not intended to preclude the application of other estate tax provisions to employee death benefits not covered by it. 1954 U.S.Code Cong. & Admin.News, pp. 4459, 5116. In order to determine the appropriate estate tax treatment of such benefits it is relevant to consider the treatment of employee death benefits generally under pre-1954 law. In this opinion we first consider petitioners' contention that the death benefits in question do not constitute taxable property under the

---

1. Three judges concurred on the ground that the death benefits were taxable under § 2033, which taxes the value of all property to the extent of the decedent's interest therein at the time of death. Two judges dissented on the ground that the decedent never had any interest in the death benefits during his lifetime.

Code. We shall then consider exactly which provisions apply.

### Was an Interest in Property Created?

■ Petitioners' principal argument is that none of the provisions of the estate tax law can apply because no interest in property was created by the death benefits agreements until after Porter's death.[2] They argue that, since the benefits were payable only in the event that Porter was employed at the time of his death and since his employment was terminable at will by the companies at any time,[3] the chances that the benefits would ever be paid were at most "a mere expectancy" during his life. For this argument they rely principally on Dimock v. Corwin, 19 F.Supp. 56 (E.D.N.Y. 1937), aff'd on other grounds, 99 F.2d 799 (2d Cir. 1938), aff'd sub nom. United States v. Jacobs, 306 U.S. 363, 59 S. Ct. 551, 83 L.Ed. 763 (1939), and cases that have followed it. Dimock dealt with benefits paid to a widow under a company-wide employee death benefit plan. The court held that, because the company had retained the right to revoke or modify the benefits at any time, the decedent possessed nothing more than "the right to render it possible for [his wife] to receive a grant from [the company], and that this did not constitute property" under the estate tax law. 19 F.Supp. at 60. In almost all of the cases that have

followed Dimock, either the company has expressly reserved the right to revoke or modify the plan, Molter v. United States, 146 F.Supp. 497, 500 (E.D.N.Y.1956); Estate of Barr v. CIR, 40 T.C. 227, 232 (1963); or the court has found as a matter of fact that the benefit was a mere gratuity bestowed by the employer, for which the employee gave no consideration, Hanner v. Glenn, 111 F.Supp. 52, 57 (W.D.Ky.1953), aff'd, 212 F.2d 483 (6th Cir. 1954); Estate of Saxton v. CIR, 12 T.C. 569, 575 (1949). A gratuity would pass directly from the company to the decedent's widow; it would not be includable in the employee's gross estate since it would in no sense have passed to his wife *from him.*[4]

Other cases dealing with pre-1954 law have found employee death benefits to be subject to estate taxation.[5] Estate of Garber v. CIR, 271 F.2d 97 (3d Cir. 1959), dealt with a pension plan, the funds from which were received by the employee during his life, and after death by a beneficiary that had been designated by him. The court held that the funds received by the beneficiaries were includable in Garber's gross estate under § 811(a) of the Internal Revenue Code of 1939 (the predecessor of § 2033), and laid down the general rule that "death benefits derived from funds which represent deferred compensation to the de-

---

2. 26 U.S.C. § 2033 requires that the decedent possess an interest in the property at the time of his death, and §§ 2035–2038 require that the decedent transfer an interest in property prior to death.

3. Under Massachusetts law, where there is no employment contract, employment is terminable at will by either party. Fenton v. Federal Street Building Trust, 310 Mass. 609, 612, 39 N.E.2d 414, 415 (1942).

4. The only case cited by petitioners in which a court has held that a death benefit was not subject to estate taxation, without explicitly finding the benefit to be a mere gratuity, is Libbey v. United States, 147 F.Supp. 383 (N.D.Cal.1956). In that case the employee had to choose whether to accept a ten-year annuity granted by the company which provided death benefits for his wife or to convert

the ten-year annuity into a life annuity, which would have deprived his wife of any death benefits. The court held that the employee's failure to convert the annuity was not sufficient action on his part to constitute a "transfer" to his wife under the Code. The theory under which we decide this case might require the contrary result in *Libbey* since it suggests that Porter's agreement to render services to the company was the type of consideration that might make the death benefits agreements a "transfer" under the Code. *See* discussion *infra.*

5. We note that the taxpayers in many of the pre-1954 cases cited *supra* would now be taxed under § 2039, *e. g.,* Hanner v. Glenn, *supra;* Estate of Barr, *supra;* and Estate of Saxton, *supra. See* Gray v. United States, 410 F.2d 1094 (3d Cir. 1969).

ceased, or granted under plans which explicitly [give] the decedent direct contractual rights in the funds" are includable in the decedent's gross estate. 271 F.2d at 101. *Accord,* Rosenberg v. United States, 309 F.2d 724 (7th Cir. 1962); Goodman v. Granger, 243 F.2d 264 (3d Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 57, 2 L.Ed.2d 47 (1957); Estate of Wolf v. CIR, 29 T.C. 441, 447 (1957), rev'd on other grounds, 264 F.2d 82 (3d Cir. 1959).

The death benefits in this case appear to represent "deferred compensation" in the sense that they were to be paid in consideration of Porter's future services. There was further consideration in that, by the reciprocal promise that the companies in which he owned a substantial interest would provide for his brothers' widows, he incurred a detriment. As noted, petitioners take the position that, since Porter could be discharged at any time, the likelihood that his wife would ever actually receive any of the benefits was as speculative as in *Dimock, supra.* But petitioners conceded at oral argument that under Massachusetts law the companies could not have discharged him merely to avoid their obligation under the agreements, and the relevant cases support that conclusion. Patton v. Babson's Statistical Organization, Inc., 259 Mass. 424, 427, 156 N.E. 534, 535 (1927); *cf.* Askinas v. Westinghouse Electric Corp., 330 Mass. 103, 111 N.E.2d 740 (1953); Berry v. Donovan, 188 Mass. 353, 74 N.E. 603 (1905). Far from being revocable at will by the company as in *Dimock,* the agreements expressly provided that they could "be terminated, altered or amended [only] with the writ-

ten consent *of all of the parties."* (Emphasis ours.) Furthermore, as co-owner of all three corporations, Porter was unlikely to be laid off or separated from the company against his will.

■ We think that the petitioners are correct, however, in their contention that these agreements were probably unenforceable under Massachusetts law. As a third-party beneficiary, Porter's widow could not have sued to enforce them, Saunders v. Saunders, 154 Mass. 337, 28 N.E. 270 (1891); Mellen v. Whipple, 67 Mass. (1 Gray) 317 (1854); and the cases do not support the Tax Court's conclusion that she came under any of the exceptions to the general rule.[6] The Tax Court ruled alternatively that the agreements were enforceable by the representatives of Porter's estate since it was expressly provided that they "shall be binding upon and inure to the benefit of the parties, their * * * executors, administrators, or other legal representatives." However, we do not understand in what sense these agreements could ever have inured to the benefit of Porter's estate. The death benefits were made payable to Porter's widow or his children or their issue but, in the event that neither widow nor children nor issue survived, no further payments were to be made. Since the estate could not have benefited in any way from these agreements, we doubt that it could have sued to enforce them. *Cf.* Comstock v. Bowles, 295 Mass. 250, 261, 3 N.E.2d 817, 824 (1936).

Nevertheless, we do not find the fact that the agreements were probably not enforceable under Massachusetts law conclusive. Enforceability is important

6. Most of the cases cited by the Tax Court and by respondent deal with a statutory exception to the rule, which allows certain third-party *creditor* beneficiaries to bring a "bill to reach and apply" in equity. Mass.Gen.Laws ch. 214, § 3(7). The one case cited involving a third party *donee* beneficiary makes clear that such a beneficiary can sue only if some of the consideration for the agreement moves from him. Green v. Green, 298 Mass. 19, 21, 9 N.E.2d 413, 415 (1937). Despite the broad dictum in Choate v. Assessors

of Boston, 304 Mass. 298, 303–304, 23 N.E.2d 882, 886 (1939), the only cases that we have found in which a beneficiary was allowed to sue in the name of the party who made the contract are Grime v. Borden, 166 Mass. 198, 44 N.E. 216 (1896), and Fay v. Guynon, 131 Mass. 31 (1881). Both are cases in which a husband and wife made a covenant with a third party solely for the purpose of making an agreement between themselves enforceable at law.

principally as an indication of the likelihood that the agreements will be honored in fact. In the instant case the estate could presumably have sued for breach of contract to recover the funds for its own benefit, had the agreements not been honored. *See* Mass.Gen.Laws ch. 228, § 1; Hunt v. Whitney, 4 Mass. 620, 621 (1808); *cf.* Chamberlain v. Henry, 263 Mass. 63, 160 N.E. 317 (1928). Legal pressure could therefore have been exerted on the companies to honor the agreements. Furthermore, realistically speaking, it is most unlikely that reciprocal agreements among three brothers who have been associated together in business for approximately thirty years would not be honored after their death.

### Taxability under the Code

The death benefits do not appear to be taxable under 26 U.S.C. § 2033 since Porter had parted with any right to receive payments prior to the "time of his death." [7] *See* the Tax Court opinion below, 54 T.C. No. 103, at 22 (Tannenwald, J., concurring). *See also* Worthen v. United States, 192 F.Supp. 727, 733 (D.Mass.1961); Kramer v. United States, 406 F.2d 1363, 1369–1370, 186 Ct.Cl. 684 (1969); Estate of Wadewitz v. CIR, 39 T.C. 925, 931–935 (1963), aff'd, 339 F.2d 980 (7th Cir. 1964). In Estate of Garber v. CIR and the cases cited with it *supra*, in which death benefits were taxed under § 2033, the decedent retained the right to receive payments from the fund in question until the time of his death.

■ We agree with the Tax Court that these agreements constituted a transfer by Porter to his wife in contemplation of his death, within the meaning of § 2035.[8] The term "transfer" "must, we think, at least include the transfer of property procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another." Chase National Bank of City of New York v. United States, 278 U.S. 327, 337, 49 S.Ct. 126, 128, 73 L.Ed. 405 (1929); *accord,* Worthen v. United States, *supra,* 192 F.Supp. at 733–734; Davis v. CIR, 27 T.C. 378 (1956); Estate of Nevin v. CIR, 11 T.C. 59 (1948). The consideration for the death benefit payments came from Porter in that he continued in the employ of the company until his death and by virtue of the reciprocal agreement that the companies would provide for his brothers' widows. The benefits were, in effect, a gift from Porter to his wife; the companies made the payments to her in return for the consideration that had been received from him. The fact that it would have been difficult to determine the value of her interest at the time the agreements were made is irrelevant. "The taxable event is a transfer *inter vivos*. But the measure of the tax is the value of the transferred property at the time when death brings it into enjoyment." Helvering v. Hallock, 309 U.S. 106, 111, 60 S.Ct. 444, 447, 84 L.Ed. 664 (1940).

■ Petitioners take the position that the statutory presumption that this transfer was made in contemplation of death, *see* note 8 *supra*, is rebutted by the facts of the case. They stress that,

---

7. 26 U.S.C. § 2033, the broadest provision of the estate tax law, states: "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."

8. 26 U.S.C. § 2035 provides in relevant part:
   "(a) The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.
   "(b) If the decedent [makes such a transfer] within a period of 3 years ending with the date of his death, * * * [the transfer] shall, unless shown to the contrary, be deemed to have been made in contemplation of death * * *; but no such transfer * * * made before such 3-year period shall be treated as having been made in contemplation of death."

although Porter entered the hospital for gall bladder surgery the day after the agreements were executed, the surgery was elective in nature, the statistical probability of death from this type of surgery is less than one per cent, and Porter's death did not in fact result from it. While these arguments are persuasive, they are not adequate to rebut the statutory presumption as a matter of law. The test is the decedent's own apprehensions at the time the transfer is made, not the statistical probability that he will actually die. Allen v. Trust Co. of Georgia, 326 U.S. 630, 635, 66 S.Ct. 389, 90 L.Ed. 367 (1946). Viewed in this light, Porter's execution of the agreements one day prior to undergoing surgery raises an extremely strong inference of contemplation of death. Moreover, as stated above, he had been ill for several months immediately prior to the operation.

 Petitioners also argue that these agreements were merely amendments to an earlier set of agreements executed by the three brothers in 1955. The purpose of these "amendments," it is contended, was merely to provide for a larger amount of money in order to reflect the rise in the cost of living since 1955. But we do not find this contention persuasive since the payments under the 1955 agreements were based on a percentage of the decedent's income, which, it is reasonable to assume, had risen along with the cost of living. The logical inference from the facts of this case is that in 1964 Porter sought a new formula that would make more liberal provision for his family after his death and that the impetus for the new agreements was his contemplation of the possibility of death. For the Tax Court to draw this inference was certainly not reversible error.[9]

9. We attach less significance to the purely formal considerations stressed by the Tax Court, i. e., that the 1955 agreements were formally cancelled rather than amended, that the 1964 agreements added a clause that the agreements could not be terminated or amended without the consent of

Having found liability under § 2035, there is no need to consider whether the estate would be alternatively liable under § 2036, "transfers with retained life estate," or § 2038, "revocable transfers." *Compare* Hurd v. CIR, 160 F.2d 610, 612 (1st Cir. 1947), *and* Davis v. CIR, *supra*, 27 T.C. at 381–382, *with* Kramer v. United States, *supra*, 406 F.2d at 1368–1369.

Affirmed.

both parties, and that the 1955 agreements appear to be phrased in terms of a continuing offer. Even without a "no termination" clause, the 1955 agreements were binding until modified by the agreement of both parties. The other differences are merely changes in phraseology.